UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WESTFIELD INSURANCE COMPANY                                                    PLAINTIFF

v.                                                                                                    CASE NO. 3:07-CV-86-S

RADCLIFF AUTOMOTIVE, LLC, and                                              DEFENDANTS
MICHAEL LEE BERNARD

**MEMORANDUM OPINION**

This matter is before the court on the motion of defendants Radcliff Automotive, LLC ("Radcliff Automotive") and Michael Lee Bernard ("Bernard") (hereinafter collectively, "Defendants") for summary judgment (DN 26), and on the cross-motion of plaintiff Westfield Insurance Company ("Westfield") for summary judgment (DN 42). Both motions have been fully briefed (DN 37; DN 41; DN 48; DN 51). For the reasons that follow, Defendants' motion will be denied and Westfield's motion will be granted.

BACKGROUND

Westfield entered into a contract of commercial insurance coverage (the "Policy") with Radcliff Automotive, annually, for the period beginning in April 1999 and ending in April 2006. At issue is whether the Policy covers Radcliff Automotive for the more than $1.2 million that Joseph Donald Roby ("Roby") stole from Defendants during that period.

Defendants and Roby had a business relationship defined by the Business Agreement between Auto Venture, Inc. ("Auto Venture")[1] and Roby entered into in March 2003. Pursuant to the Business Agreement, Auto Venture provided a revolving line of credit to Roby to finance the

---

[1]Auto Venture, a related company of Defendants', is not named as a defendant here.

purchase of motor vehicles for the purpose of wholesaling them to auto dealers. The Business Agreement provided that Auto Venture would have a lien on each vehicle purchased, and Roby would receive the net profit on each vehicle sold. *Defendants' Motion for Summary Judgment*, *Ex. B*, Business Agreement, ¶¶ 1, 4.

The Business Agreement also required Roby to assume certain risks and liabilities relating to the vehicles, maintain a $2 million life insurance policy in favor of Auto Venture, and sign a personal guarantee to Auto Venture. *Id.* at ¶¶ 6-10.

As further security for the loans, Defendants physically took possession of the titles to the vehicles that Roby purchased. Once Roby sold a vehicle and repaid Defendants the purchase loan money, Defendants released the corresponding title to Roby. At some point, however, Roby began a fraudulent scheme whereby he obtained duplicate titles for the vehicles that he held for wholesale in an attempt to avoid Defendants' security interests. It was a rudimentary theft and fencing operation. Roby sold and transferred the vehicles to third parties and retained all proceeds for himself, leaving Defendants holding the defunct original titles.

Defendants eventually discovered Roby's scheme and filed criminal charges against him for fraud and theft, in Jefferson County, Kentucky. Roby subsequently pled guilty to three counts of theft by deception, admitting to the following:

> Between 03/25/00 and 02/27/04 in a continuous course of criminal conduct, [Roby], acting in complicity with his Co-Defendant [Betty Jean Roby], forged checks valued in excess of $1,200,000.00 intended for Auto Venture and illegally deposited them in his own bank account or in the accounts of associates. *Complaint*, *Ex. B*, Guilty Plea of Roby.

Defendants notified Westfield of Roby's scheme in 2004, seeking recovery of their loss under the Policy. Westfield denied Defendants' claim. Defendants reasserted their claim in 2006.

Westfield denied it again in 2007.

Westfield filed a Complaint with this court seeking a judgment declaring that it has no duty to extend coverage to Defendants for the actions of Roby discussed above. Both Defendants and Westfield have moved for summary judgment on the issue of whether Defendants' loss is covered under the Policy.

The court has diversity jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332.[2] Venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The dispute also must be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89, 88 S. Ct. 1575,

---

[2] Westfield is a corporation with its principal place of business in Ohio. Defendants are both Kentucky citizens.

20 L. Ed. 2d 569 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Defendants argue that their loss is covered under the Policy's Building and Personal Property Coverage Form and Garage Coverage Form, as modified by the Fraudulent, Forged or Counterfeit Title Coverage extension. Westfield argues that, to the contrary, the same provisions expressly exclude Defendants' claims. To determine whether the Policy covers Defendants' loss, the court must answer two preliminary questions: (1) What is the nature of Defendants' loss? and (2) Was Roby Defendants' agent?

Westfield argues that if Roby was Defendants' agent, then Defendants' claims are excluded no matter the nature of Defendants' loss. Therefore, the court will address the agency question first. Westfield argues that Roby was Defendants' "agent" or "employee" under the Policy. Defendants assert that Roby was an independent businessman with whom their relationship was "creditor/debtor."

"Employee" is defined in the Policy's Garage Coverage Form:

"Employee" includes a "leased worker". "Employee" does not include a "temporary worker". . .

"Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of you [sic] business. "Leased worker" does not include a "temporary worker". *Plaintiff's Response to Motion for Summary Judgment*, *Ex. 5*, Garage Coverage Form, pp. 14-17.

Westfield does not argue that Roby was a "leased worker," or an employee of Defendants' as the term is commonly understood, i.e. that Roby worked for salary or wages (which he did not), etc. Instead, Westfield points to a Uniform Incident Report issued by the Louisville Metro Police

Department stating that Roby was Defendants' employee. *Plaintiff's Response to Motion for Summary Judgment*, *Ex. 6*, Uniform Incident Report. However, a statement in a police report is not conclusive of Roby's employment status. Neither, as Westfield contends, is information contained in the Policy stating that Radcliff Automotive maintained at least one insured employee at the location where Roby held vehicles for sale. *Plaintiff's Motion for Summary Judgment*, *Ex. 7*, Garage Coverage Form – Auto Dealers Supplementary Schedule. Moreover, Roby stated in an affidavit that he was not an employee of Defendants'. *Defendants' Motion for Summary Judgment*, *Ex. A*, Affidavit of Joseph P. Roby, ¶ 4. Westfield has failed to satisfy its burden of proof that Roby was Defendants' employee under the Policy.

"Agent" is nowhere defined in the Policy. Thus, Westfield argues that it remains a genuine issue of fact whether Roby was Defendants' agent. However, "The existence of an agency relationship is a legal conclusion to be reached only after analyzing the relevant facts." *Couch v. Natural Res. and Envtl Prot. Cabinet*, 986 S.W.2d 158, 161 (Ky. 1999). After having analyzed the nature of Defendants' and Roby's relationship as defined by the Business Agreement and realized by the parties' course of conduct, the court finds that Roby was not Defendants' agent under the Policy.

Westfield argues that the Business Agreement was "nothing more than a convenient device designed by [Defendants] and Roby for the purpose of disguising their true [agency] relationship should disavowal later become expedient, as it has in this case." *Plaintiff's Response to Motion for Summary Judgment*, p. 4, n.7. However, there is no evidence that the Business Agreement was ineffectual and there are no illusory terms contained therein. On the contrary, the terms of the Business Agreement define Defendants' and Roby's entire relationship. The finance, security

interest, and personal guarantee provisions of the Business Agreement indicate a creditor/debtor relationship. The hold harmless and indemnity provisions and certified acknowledgment that Roby's employees are not Auto Venture's employees indicate something other than an agent/master relationship. The Business Agreement suggests that Roby was not Defendants' agent in contract.

The parties' actual conduct confirms that Roby was not Defendants' agent in fact. Under Kentucky law, the existence of agency is proved by the circumstances rather than simply what a party claims his legal status to be. *See, e.g., Muir v. Glossbrenner Motors Co.*, 276 S.W. 1058, 1060 (Ky. 1925). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *McAlister v. Whitford*, 365 S.W.2d 317 (Ky. 1963).

Westfield argues that Roby acted both as broker and salesman for Defendants. It is undisputed that Roby bought and sold vehicles in Auto Venture's name with ownership, title, and sales proceeds accruing directly to Defendants. However, Roby was not buying and selling vehicles for Defendants' benefit. Roby was acting on his own behalf, seeking profits for himself. Roby purchased and titled vehicles in Auto Venture's name for the purpose of securing the purchase loans and for the sake of expediency. Such means of transacting business are badges of agency but emblematic of nothing.

Roby was not Defendant's actual or ostensible agent. He did not flash his badges of agency, so to speak, or hold himself out as Defendants' agent. Roby stated in his affidavit that he operated solely in the name of "Roby's Wholesale." Nor did Defendants hold Roby out as their agent. Bernard's lone reference to "Donald Roby, representing Auto Venture, Inc." in his letter to customers seeking information during the course of the police investigation was clearly by way of

explanation. *Plaintiff's Response to Motion for Summary Judgment*, *Ex. 8*, Bernard Letter to Town & Country Ford. Like the police report and insurance form mentioned above, Bernard's letter is not conclusive of the legal status of Defendants' and Roby's working relationship.

Roby did not act subject to Defendants' control, which reaffirms the absence of an agency relationship. "Under Kentucky law, the right to control is considered the most critical element in determining whether an agency relationship exists." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46 (Ky. 2003) (internal citation omitted). It is undisputed that Defendants asserted no control over Roby's day-to-day operations. Roby was free to buy and sell vehicles as he pleased. He was free to hire his own employees, etc.

Westfield argues that the Business Agreement "required" Roby to purchase vehicles in Auto Venture's name, and to maintain and sell the vehicles at Defendants' property.[3] However, it is axiomatic that parties to a contract are "required" to comply with its terms. Roby's adherence to the Business Agreement is no evidence of Defendants' control over him. The token evidence that Roby was Defendants' agent is superseded by the realities of the parties' actual business relationship.

Because Westfield has failed to satisfy its burden of proof that Roby was Defendants' agent under the Policy, the court will refrain from addressing Westfield's further arguments that Defendants' claims are variously excluded from coverage on that basis.

An insured is entitled to all the coverage that he can reasonably expect to be provided under a policy of insurance. *Simon v. Cont'l Ins. Co.*, 724 S.W.2d 210, 212-213 (1986). Only an

---

[3]The court notes that Roby once owned the property at issue before selling it to another of Defendants' companies to pay down his line of credit. The fact that Roby continued to operate his business out of the same location after the sale, paying approximately $5,000 per month in rent further tends to negate the existence of an agency relationship.

unequivocally conspicuous, plain and clear manifestation of an insurance company's intent to exclude coverage will defeat this expectation. *Id.* The burden is on an insurance company to demonstrate that the damages claimed fall within an exception within their policy. *New Hampshire Fire Insurance Co. v. Rupard*, 220 S.W.2d 538, 542 (1920).

Defining the nature of Defendants' loss is, of course, prerequisite to determining whether it is covered under the Policy. Defendants alternatively argue that they lost – that Roby stole from them – vehicle titles or the vehicles themselves. Westfield argues that Roby stole either vehicles or money. The court finds that Roby did not steal vehicles or titles but rather the proceeds from vehicles sales owed to Auto Venture.

It is undisputed that Roby purchased the vehicles at issue in Auto Venture's name for the sole purpose of resale to auto dealers in exchange for money payable directly to Auto Venture. Thus, it was not Roby's sale of the vehicles and transfer of titles to third persons that breached the Business Agreement or violated the law. Defendants intended that Roby sell the vehicles; the Business Agreement was based entirely upon the proceeds from Roby's vehicles sales. Defendants also assented to Roby's transfer of the vehicle titles. Defendants themselves "released" titles to third parties only to the extent that they physically relinquished the certificates to Roby. Defendants admit that the vehicles were titled in Auto Venture's name and held in Defendants' physical possession simply as security for the loans and as a matter of convenience for the parties.

Defendants did not intend that Roby fraudulently obtain duplicate titles, of course. However, it was Roby's forgery of checks intended for Auto Venture, not his forgery of the titles, that defines the nature of Defendants' loss. Pursuant to the Business Agreement, the proceeds from Roby's sales of the vehicles were to be deposited into Auto Venture's bank account. Business Agreement, ¶ 3.

By retaining the proceeds for himself, Roby stole money owed to Auto Venture. Accordingly, the only question going forward is whether the Policy covers Defendants' lost proceeds.

Though Defendants argue that the Policy covers their loss on the bases that it covers lost titles and lost vehicles, the court will nevertheless look to the specific provisions cited by Defendants in order to determine whether they reach to cover lost proceeds.

Defendants argue that their loss is covered under the Policy's Fraudulent, Forged or Counterfeit Title Coverage provision, which modifies the Garage Coverage Form and states in relevant part:

> 6. FRAUDULENT, FORGED OR COUNTERFEIT TITLE COVERAGE
> We will pay for "loss" due to the acceptance, in good faith, in exchange for merchandise, money or services, any "title" to an "auto", if the "title" is proven to be fraudulent, counterfeit or forged, and a criminal warrant is obtained for the arrest of the person or persons fraudulently executing the "title". . .
>
> The following words have special meaning for this coverage only:
>
> **b.** "Loss" means the required return of an "auto" to its rightful owner after the "insured" has acquired it by accepting a fraudulent, counterfeit or forged "title."
> *Defendants' Motion for Summary Judgment*, *Ex. 3*, Policy, ¶ 6.

It is undisputed that Roby fraudulently obtained duplicate titles for the original titles held by Defendants, and that a criminal warrant was issued for Roby. However, Defendants did not suffer "loss" as defined by this coverage. This provision covers Policyholders who obtain vehicles with invalid, illegal titles and are required to return the vehicles to their rightful owners. Defendants did not receive any vehicles with fraudulent, counterfeit or forged titles that they had to return to the vehicles' rightful owners. Defendants' lost proceeds are not covered under this provision.

Defendants further argue that the Garage Coverage Form's Physical Damage Coverage provision covers theft of an automobile. *See* Garage Coverage Form, Section IV (A)(1)(a)-(b), at

-9-

9. However, as discussed above, the vehicles at issue were not stolen. The Physical Damage Coverage provision covers "loss" to a covered "auto" or its equipment. *Id.* The Physical Damage Coverage provision does not cover Defendants' lost proceeds.

Defendants also argue that their loss is covered under the Policy's Building and Personal Property Coverage Form, which states in relevant part:

> **A. Coverage**
> We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss. *Plaintiff's Response to Motion for Summary Judgment*, *Ex. 9*, Building and Personal Property Coverage Form, ¶ A.

Defendants argue that the vehicles at issue sold by Roby are "Vehicles or self-propelled machines or autos you manufacture, process or warehouse" and/or "Vehicles or self-propelled machines, other than autos, you hold for sale," and therefore are not "Property Not Covered" – that is to say, they are "Covered Property"– under this provision. *See Id.* at ¶ A(2)(o)(2)(a)-(b). However, again, whether the vehicles or certificates of title at issue are Covered Property is irrelevant. The proceeds from the sales of the vehicles are not Covered Property.

Under the Policy's Building and Personal Property Coverage Form, proceeds are expressly excluded from being considered Covered Property:

> **2. Property Not Covered**
> Covered Property does not include:
> **a.** *Accounts*, *bills*, *currency*, deeds, food stamps or other *evidences of debt*, *money*, *notes* or *securities*. . . Building and Personal Property Coverage Form at ¶ A(2)(a) (emphasis added).

Therefore, Defendants' lost proceeds are not covered under this provision.

There is no coverage provision within the Policy that otherwise provides for the type of loss that has been alleged by Defendants. Therefore, construing the evidence in a light most favorable

to Defendants, Westfield is entitled to summary judgment declaring that the Policy does not provide coverage for Defendants' claims or losses sustained in connection with Roby's fraudulent scheme.

## CONCLUSION

Because the court finds there are no genuine issues of material fact and Westfield is entitled to summary judgment as a matter of law, Westfield's motion for summary judgment will be granted. Defendants' motion will be denied.

A separate order will be entered herein this date in accordance with this opinion.